Taylor *v.* Coriell.

MARY E. TAYLOR

*v.*

ELLEN CORIELL, administratrix of Richard B. Coriell,
deceased, at al.

[Filed April 22d, 1904.]

1. Where it clearly appears that a deposit made by a parent to the joint account of the parent and a child is made for the convenience of the parent in drawing money, and not with the intention of making a gift to the child in case she survived her parents, a subsequent change of intention must be proven by clear and satisfactory evidence. Merely permitting the account to remain in their joint names is insufficient.

2. The contract between joint depositors and the bank relating to the right and method of withdrawing a deposit is not controlling evidence on the question as to whether one, in making the deposit jointly with the other, intended a gift to the other.

3. In order to make a gift effective, the evidence should show an intention on the part of the donor to divest himself of the possession and control of his property, and it should be inconsistent with any other intention.

4. Evidence *held* insufficient to prove a gift *inter vivos*, but, on the contrary, to show that the gift was limited to take effect after the father's death, and hence was void, being a testamentary disposition of the fund in a manner contrary to the statute of wills.

5. In order to legalize a gift *inter vivos*, there must be an absolute parting, on the part of the settler, with the interest which had been his up to the time of the making of the gift.

*Mr. George S. Hobart,* for the complainant.

*Mr. William A. Lewis,* for the defendants.

BERGEN, V. C.

August 8th, 1888, Richard B. Coriell deposited in the Provident Institution for Savings, in Jersey City, the sum of $207.56

Taylor *v.* Coriell.

and caused the account to be opened on the books of that institution in the name of "Richard B. and Mary E. Coriell," in which form it remained until his death, in 1902. The account was increased from time to time by deposits and decreased by drafts made against it, all such drafts being made by Richard. The balance standing to this account, with interest added to the 1st day of January, 1904, is $2,504.28, the ownership of which is the disputed question in this cause.

The complainant, Mary E. Taylor (formerly Coriell), whose name appears in the joint account, claims it as a gift *inter vivos* from her father, Richard, and the defendant, as the widow of Richard, insists that it was his property at the time of his death and should be paid to her as the administratrix of his estate. When the bill of complaint was filed the widow was made a defendant individually, but being subsequently appointed administratrix, the pleadings were amended so that she now appears on the record as defendant in a representative capacity. The relief desired is to have the defendant permanently enjoined from drawing the fund, she holding the pass-book, and the prayer in the answer is that the bill be dismissed. The Provident Institution was also made defendant and has formally answered, admitting its liability to pay to either the daughter or widow when their rights have been established.

At the time the original deposit was made the savings institution issued and delivered to Richard, the father, a pass-book usual in such cases, in which the names of the depositors were entered in the same form as on the books of the bank; this book contained a printed copy of some of the regulations of the bank, subject to which deposits were received, one of which was: "But no person shall receive any part of his principal or interest without producing the original book that such payments may be entered therein."

The following circumstances preceding the opening of this account are, in my judgment, sufficiently proven to justify their acceptance: That in 1876 a son of Mr. Coriell died, having a small sum of money standing to his credit in the Provident Institution, to secure the payment of which the father was re-

quired to administer; that at this time there was an account in the same institution standing to the credit alone of the former wife of .Mr. Coriell, in which she was described as the "wife of Richard B. Coriell;" that some time after 1876, and previous to the death of the wife, this account was changed on the books of the bank by erasing the words "wife of," thus leaving the account in the joint names of the wife and husband; that after the death of the wife, and when the complainant arrived at the age of twenty-one years, and on August 8th, 1888, the husband drew from this account the balance standing to his credit, $107.56, and on the same day opened the account in the name of himself and daughter, adding $100 to the sum drawn, thus making the first deposit in this account stand at $207.56; that two of the brothers of the complainant had accounts in this bank, and in both instances the name of the complainant appeared as a joint depositor, so that after the death of the son, in 1876, every savings account belonging to any member of this family stood in the names of two persons, and after the death of the mother one of the names in each case was that of this complainant, who does not, so far as appears, make any claim to the ownership of any of these funds other than the one now in question; that in one case her name has been replaced by that of the wife of one of the brothers, who had married after the account was opened; that Richard, the father, explained to the defendant that his reason for keeping the account in the joint names of himself and the daughter was because he had had trouble with his son Eddie's account when he died, and he wished to avoid having any such trouble again, and that she need not worry as she should have a third of the money.

These circumstances satisfy my mind that it was the settled policy of Richard B. Coriell to have every savings account in which any member of his family was interested stand in the name of two persons, and that the only reasonable presumption to be deduced from these facts is that his purpose was to provide for the convenient management of the fund in the event of the death or incapacity of the owner and depositor of the money, and further evidence of his intention as to this particular

fund is the fact that he retained until his death the possession and control of the pass-book, which carried with it the absolute control and management of the fund, and that at different times he drew large sums of money from it, at one time nearly depleting the account, withdrawing at a single draft $1,450, leaving a balance of only $34.41, showing "that the case in its inception was one of trust for himself and not of gift" to his daughter. *Schick* v. *Grote, 15 Stew. Eq. 352.* If it clearly appears that a deposit made to a joint account is merely for the convenience of the parent in drawing money and not with the intention to make a gift to the child in case of it surviving its parent, a subsequent change of intention must be proven by clear and satisfactory evidence. Permitting the account to remain in joint names is not sufficient. *Skillman* v. *Wiegand, 9 Dick. Ch. Rep. 198.*

As was said by Vice-Chancellor Pitney in *Skillman* v. *Wiegand:*

"In view of the well-known practice of savings banks to pay money on the presentation by the depositor in person of his or her pass-book, the motive of convenience in drawing money without personal attendance becomes at once prominent and a not uncommon purpose in the placing of moneys in bank to joint account. * * * And in case of savings banks, the proprietor of the fund by retaining the pass-book in his possession retains complete control of it."

Mr. Coriell, the depositor, was employed during the usual banking hours in New York City, and it is not unreasonable to infer that he wished to have someone qualified to draw money if he should not be able at all times to be present. It is clear that he manifested no intention to part with his right to the control, use or disposition of the fund. *Smith* v. *Speer, 7 Stew. Eq. 336.* The complainant, however, insists that she has overcome the fair deduction to be made from the foregoing facts, that the account was established for the convenience of the father and not as a gift, by testimony showing that the fund was intended by her father at its inception to be her property, and that the donation became operative at that time. The

only witness of what then occurred was the complainant. The testimony of the other witnesses, to which I shall hereafter refer, relate to periods long subsequent to this event, and, in my judgment, afford no corroboration of a donative purpose formed and executed in August, 1888. The complainant made some general statements, but when asked to recite what her father said at that time her reply was that he used the following words:

"I am going to take you down and have your name put on the book, as you are my oldest daughter at home and are keeping house for me, and I want you to have whatever there is."

Being further questioned, she said, at no other time did he give any reason for opening the account in the form in which it stands. With the exception of the last clause above quoted, all that he said was consistent with his apparent policy of having her name "on the book" for the convenience of the fund, and as to the latter clause, if construed as a donation, it would be limited to that particular deposit, which he afterward withdrew from the bank and applied to his own purposes. Whether the father made the admission in the language used by the witness with the purpose of actually transferring the ownership of the fund to her as a gift, viewed in the light of his subsequent acts, is debatable and is not as convincing as it should be to entitle the complainant to establish the ownership she sets up. Evidence of declarations in the nature of admissions is always received with great caution, and when ascribed to a deceased person, and testified to only by the party to be benefited, it should be closely scrutinized, and, before giving it controlling force, the subsequent acts of both parties, together with their relation to each other, should be fully considered. When this gift was made, as claimed by the complainant, her father was a widower, with five children, three of them daughters, and all but one living at his home in Jersey City, and the effect of this gift was to deprive his other children (one of them a daughter only about twelve years of age) of any portion of, or interest

in, his personal estate, whatever real estate he had having been conveyed to all of the children as tenants in common.

The complainant married two years after this alleged gift and left home in August, 1890, and her father married his present widow in December, 1890. At the time the complainant left her father's home the total amount of this fund, including interest, was $535.83, no drafts having been made prior to this time and but three deposits of $100 each.

From the inception of the fund until the day of his death the father treated it as his own, having under his absolute control the pass-book, with power to draw whenever he saw fit. The fund was added to from time to time, so that on August 10th, 1894, four years after the complainant had left home, it amounted to $1,484.41, at which time the father drew from the account $1,450, leaving a small balance of only $34.41. The money which he drew he disposed of to his own use, to the knowledge of the complainant, and without her protest, and subsequently, on three different occasions, exercised the same right of control by drawing and disposing of the money for his own purposes. Manifestly this conduct on the part of the father, and the acquiescence by the daughter thereto, is not consistent with her claim that the fund had been given to her *inter vivos,* but, on the contrary, indicates that her name was put in the account for the father's convenience. The testimony shows that he was employed all day in New York City and that all deposits were made from 1888 until August, 1890, by the complainant, and, after she left home, by the defendant, with the exception of a single deposit, in June, 1901, to be hereafter considered.

Under the regulations of the savings bank, above set out, the power to draw money depended upon the possession and presentation of the pass-book. That evidence of dominion was resolutely retained by the father until his death, was found among his effects and came in due course to the hands of his administratrix. In my judgment this evidence does not support the claim of the complainant that the fund was a gift to her *inter vivos* when the account was opened, and that the utmost

we are authorized to infer is that the donor intended that his daughter might have whatever was left after he had exercised the absolute control during his life, making it a testamentary disposition of funds, without complying with the law of wills.

The complainant further claims that when the account was opened there was a contract entered into between the savings institution, her father and herself, under which she obtained an irrevocable interest in the fund, so that all question of testamentary disposition is removed. Undoubtedly there was a contract between the father and the daughter on the one side and the institution on the other, by the terms of which the bank became their debtor to the extent of the amount due on the account; and that either presenting the book might draw the fund, but I cannot approve the contention that such contract is, as between the father and the daughter, controlling evidence on the question of a gift *inter vivos*. Their rights to the fund depend upon the character of their respective relations thereto, and if it appears that the father furnished the money making up the deposit, that the account was opened in their joint names for the convenient holding and management of the fund by one party for the other, a court of equity would declare their rights according to good conscience, and to avoid the application of the law of wills it must appear that the donor had surrendered all control over the subject-matter. Upon this point my attention has been called to *Dunn* v. *Houghton, 51 Atl. Rep. 71,* but I do not understand that in that case Vice-Chancellor Stevenson held that the contract entered into by the bank established *prima facie* a gift *inter vivos* but that a distinct donative intention on the part of the donor must appear, and he sums it up in the following language: "The question whether there was a gift or not is determined in each case solely by the purpose of the alleged donor."

The facts in the case under consideration are materially different from those existing in *Dunn* v. *Houghton.* Among other things, it was shown in the latter case that the fund claimed to be the subject of the gift was never diminished but preserved in precisely the same condition it presented on the

day of the alleged gift, while in the present case the original deposit, a gift of which is claimed, was withdrawn and disposed of by the depositor and the donative intention not proven.

The complainant, however, further insists that the testimony of the witnesses on her behalf establish the original donative intention of her father, and that from subsequent statements and admissions made by him it is proven that it was his intention to give her the money at the time of the deposit, in 1888. The complainant testified that in 1889 she went with her father to the bank, at which time he drew a portion of the money. The only draft against the account about that time is under date of February 10th, 1899, when the father drew $65; that her father then said: "My daughter has married since this account was opened, and the money is hers; I don't want her to have any trouble; I should like to have it changed to her married name." If this witness has correctly stated what was said it would mean that the money then on deposit belonged to her, for there are no qualifying words, yet on that very occasion the father did draw and appropriate to his own use a part of the funds in which, if he is correctly quoted, he had no interest or right whatever. The subsequent conduct of both parties with regard to the money does not justify the belief that he used the precise language stated, for on another occasion he drew and used of this money $300 and continued to use the fund as his own and did not relinquish his control over it.

The great interest of the complainant in the result of the case leads me to the conclusion that we cannot safely rely upon her statement that she has given the precise words of the deceased, especially when the subsequent acts of the parties do not accord with the statement.

The testimony does not refer to future ownership, but declares it was then the property of the complainant. The deed cannot in words explain his intention but his acts do, and they contradict the statement. I am led to the belief that the father's anxiety was with regard to the convenient handling of the fund in case of his death. It was to preserve the policy of having two persons, either of whom might be able to draw the funds,

in case of necessity, that he wanted the change made to the married name of his daughter, fearing that some complication might arise over the change in her name, and his dominant intention frustrated. That he did not intend that the daughter then had title to the fund is demonstrated by the fact that, subsequent to that date, he drew and appropriated a part of the very money which it is alleged he then said was his daughter's.

The testimony of the other witnesses do not establish any donative intent but relate entirely to the intention of the father as to the disposition of the fund after his death, and nearly all relate to a period later than 1900. In speaking of the declarations of the father, one witness testified that he said: "That when he died there would be no question about anything, everything was the way he wanted it to go." Another testified that he told the complainant: "Your name is on the book and the money is yours if anything happens to me." To another: "If anything happens to me, Mamie is to have that money." And to another, at the time of their uncle's funeral: "The money in the bank belonged to Mary Emma if anything happened to him." To still another: "That money is Mamie's; as when I am through with it the money is hers; and I want her to have it." To another he said that in case of his death the money should go to her.

To make a gift effective the evidence should show an intention on the part of the donor to divest himself of the possession of his property, and it should be inconsistent with any other intention. *In re Bolin, 136 N. Y. 177.* All of this evidence tends to disprove the claim of the complainant of any present gift of the fund, and shows that whatever intention the father had with reference to it related to its disposal after his death.

The deceased married his second wife, the defendant, in December, 1890, and until his death she had charge of his home and was in every way, so far as the evidence discloses, a faithful, economical wife, aiding in the accumulation of the funds in dispute, acting as her husband's agent, depositing moneys to his account, and when she called his attention to

the form in which the account stood he assured her that it was opened in that manner because he had had trouble with his son Eddie's account when he died, and he wished to avoid having any such trouble again; that she need not worry, as she should have a third. In this she is corroborated by her daughter, Mrs. Dowling. The evidence discloses that the house in which they lived had been transferred to the children and that substantially all his remaining property was embraced in this account. To accede to the claim of the complainant would leave this widow penniless so far as her husband's estate is concerned, and to attribute to Mr. Coriell a deliberate intention to deceive his wife and leave his widow in this condition we should be supported by convincing proofs of that intention.

I am entirely satisfied that this evidence does not tend to prove a donative intention within the rule required for such purpose, and that the only justifiable inference is that the money was first put in the joint account merely as a convenience for the father; that he did not then intend to part with his property in it, and that he always claimed and exercised a right of absolute ownership over it, and that the gift of this fund to his daughter was limited to take effect after his death, and falls within the rule announced in *Stevenson* v. *Earl, 55 Atl. Rep. 1091.* In the case just cited, the chief-justice, speaking for the court of errors and appeals, in defining the requisites of a gift *inter vivos,* said: "But, in order to legalize such a gift, there must be not only a donative intention, but also in conjunction with it a complete stripping of the donor of all dominion or control over the thing given."

It is perfectly clear from the evidence in this cause that the father intended to and did retain his control over the thing given, and that the most liberal construction in favor of the complainant that can be given to this evidence is that it was his wish that she should have whatever remained after his death. Even if we assume a donative intention proven, the other element, the stripping of the donor of all dominion or control over the gift, is wanting. There is no pretence that the father lost all dominion at any time. The account stood in

Taylor *v.* Coricll.

his name as well as of his daughter; he retained the effective
means of control, the pass-book, in his possession until his
death, and during his whole life exercised exclusively the right
of ownership over the whole, drawing, using and depositing
according to his own will and pleasure. There was no trust
in favor of the complainant, for the indispensable element, the
absolute parting with "that interest which had been his up to
the time of the declaration," is not present. In order to create
a trust there must be specific property held by the trustee. It
was argued that there was a distinction to be drawn between the
case of *Stevenson* v. *Earl* and the one under consideration, for
the reason that in the former case the title to the fund never
vested in the claimant; that she had no control, and could have
none, over the principal fund during her husband's life, while
in the present case the claimant, if she could obtain possession
of the bank-book, might draw the money; but I think this
argument has little weight, for if the complainant was not to
be entitled to the ownership of the fund until after her father's
death, the fact that she might obtain possession of the book
and draw the money would not, as between her father and her-
self, give her the right to hold the fund against his claim and
demand; she would be bound to turn it over to him.

There is still another claim of the complainant to be dis-
posed of, and that is that she claims to have deposited a portion
of this money, the result of her own savings; but I find that
there is no proof in the case to warrant the allowance of any
such claim. She left home in August, 1890, and from that time
until 1901 does not show by any satisfactory evidence that she
furnished any money for this account. When she left but three
deposits of $100 each had been added to the original fund. In
her examination-in-chief she was shown the bank account con-
taining the account and testified that she was not able to
identify a single deposit as being made from her personal earn-
ings. As but three had been made while she was at home, after
which time the pass-book seems to have been in charge of the
defendant, it is remarkable that her recollection was so deficient
about so important a transaction, and when we consider that

Taylor v. Coriell.

she further testifies, in a general way, that she had from her savings deposited in this account about twelve or fourteen hundred dollars, when the total amount of such deposits, in addition to the original sum, only amounted, at the time she left home, to $300, it is manifest that her statements are too loose and general to support her claim. As to the item of $150, which she says she deposited in 1901, she testified that, at that time, she was a tenant of her father, renting some rooms of the homestead, and one day, in the absence of the defendant, she went to the defendant's bedroom, opened the bureau-drawer, took out the pass-book, carried it to the bank and deposited to this account, of her own money, $150, returning the book to the place from which she took it, and told no one of what she had done. I cannot credit this story; its improbability condemns it. She was then married and the money which she deposited, she testified, was the result of her husband's earnings. It was a most extraordinary proceeding to place her husband's earnings in an account which was at all times subject to the disposal of her father, and put the evidence of her contribution to the fund beyond her reach. To sustain such a claim as this, the evidence of it ought to be convincing. On the other hand, the defendant testifies that from the time of her marriage, in 1890, every deposit written in the book was made by her on her husband's behalf from his earnings, and the circumstances tend to establish the truth of this statement, and I am unwilling to find, as a matter of fact, that the $150 were deposited by the complainant in the manner she describes. A party seeking to establish a claim of this character must justify it by evidence of such strength as to leave in the mind of the court no real doubt of its truth.

I will advise a decree dismissing the bill of complaint as prayed in the answer, with costs.