MARGARET M. McINTYRE *v.* SAMUEL K. SMITH
ET AL., ADMINISTRATORS.
[No. 33, January Term, 1928.]

*Decided April 4th, 1928.*

662

The cause was argued before BOND, C. J., URNER, AD-KINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Edgar Allan Poe,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellants.

*Charles F. Harley* and *Charles P. Coady, Jr.,* with whom was *Burdette B. Webster* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Edward McIntyre, late of Baltimore City, died intestate on or about March 6th, 1927. He had been twice married, and was survived by four children by his first wife, and by his second wife and two children by her. He had been at one time a tug boat engineer, and later, with J. Edward Henderson, engaged in the business of repairing boats. In 1922 Henderson bought out his interest in that business, and McIntyre found himself in the possession of a considerable fortune, which was largely invested in bonds. He was a skilled mechanic, thrifty and industrious, but without any knowledge or experience in matters of business or finance, and he turned over all of his personal property, including his securities, to Margaret M. McIntyre, Marie C. McIntyre, and Robert E. McIntyre, children of his first marriage, and they kept them and had them in their possession at the time of his death.

Upon his death letters of administration were granted to Charles P. Coady and Samuel K. Smith, who demanded of the three children named all securities delivered to them by their father, but they turned over only such securities as could not be passed by delivery, and refused to surrender to the administrators bonds valued at $86,500 which would pass by delivery. The administrators then filed in the Circuit Court of Baltimore City the bill of complaint in this case to compel the three children to deliver to them the bonds which they had received from their father.

In addition to the facts to which we have referred the appellees in their bill alleged that Edward McIntyre, their

decedent, who was at the time of his death seventy-one years old, "knew little or nothing about the handling of even his own finances; that he was untrained in and unfamiliar with the making of investments * * * that the defendants acted as his confidential agents, and that he placed in their hands all of his personal property, and that they placed the evidences of said property and the securities in a safe deposit box or boxes controlled absolutely by them; and that the said Edward McIntyre had every faith and confidence and trust in them, and that their possession and custody of said property were upon trust for him, and that he and his said property were entirely in their hands; and that, having such confidence in them, it never occurred to him that they would betray his trust; * * * that your orators aver that after the death of the said Edward McIntyre, the said defendants turned over to them only such securities as could not be passed by delivery and retained all bonds that could pass without endorsement, and among the bonds so retained were fifty-four thousand dollars ($54,000) Federal Land Bank bonds, thirty thousand dollars ($30,000) United States Liberty bonds and twenty-five hundred dollars ($2,500) foreign bonds (French, Belgium and Denmark), and that these bonds and others they concealed from your orators and refused to turn over the same as property of their deceased father," and that they, "in utter violation of the trust reposed in them in their reversed confidential relationship, had withheld and retained from your orators unregistered negotiable coupon bonds of the value of approximately ninety thousand dollars. * * * That when your orators demanded the delivery to them of said bonds, the defendants frankly admitted that they had such bonds in their possession, but they absolutely refused to turn them over to your orators," and that "although the defendants received all of the securities from their father to be kept by them as his confidential agents and trustees, and to be delivered by them to him in his lifetime or, upon his death, to his personal representatives, nevertheless, in absolute disregard of the trust so reposed in them, the said defendants accounted with your orators for only the non-negotiable securities and kept in their possession said unreg-

istered bonds of the value of approximately ninety thousand dollars ($90,000); * * * that such unconscionable action on the part of the said defendants was a part of a scheme conceived by said defendants to obtain a greater share of their father's estate than they were entitled to under the law; * * * that there was and could be no devolution of title to said bonds upon the defendants, because they held said bonds as the confidential agents, trustees and custodians of their said father; * * * that the effect of the retention of said bonds by the said defendants will be the consummation of a fraudulent scheme on the part of the defendants to acquire a greater portion of the estate of their father than they would be entitled to by virtue of a legal distribution of his entire estate; * * * that relations of the utmost confidence existed between the said Edward McIntyre and his agents and trustees, the said defendants; and the securities which they are fraudulently and unlawfully withholding from your orators are impressed with a trust as aforesaid in favor of your orators and belong to the estate of the said Edward McIntyre." Upon these allegations the appellees asked the court to declare that the bonds were their property and were held by the appellants in trust for them, to decree their delivery to them, to restrain the defendants from selling or disposing of them or "retaining" them from the appellees, to decree that a receiver be appointed to take charge of the bonds and collect the income "therefrom" pending the suit, and for such other and further relief "as the nature of their cause" might require.

The defendants demurred to the bill, but their demurrer was overruled, and from that order they have appealed.

From the facts alleged in the bill the parties draw different conclusions, the contention of the appellees being that the appellants hold the securities involved in the appeal upon a trust which a court of equity should enforce, while the appellants contend that the facts alleged are not sufficient to raise a trust in favor of appellees, but that they hold the securities under a claim of ownership, which a court of equity has no jurisdiction to decide, but that appellees must assert their claim in some appropriate action in a court of law, and

the issue of law raised by these conflicting theories is whether upon the facts stated the action of the appellants in retaining possession of the securities is a breach of trust, or a breach of a contract of bailment for which they have an adequate remedy at law. Although appellants in their brief assert title to the bonds, that question is not in issue, for there is nothing in the bill to support the inference that appellants hold the bonds under a claim of title, or that they contend that they were given to them by their father during his life, the allegation being merely that they received the bonds in trust to be delivered to the decedent during his life or to his personal representatives upon his death, and that, in violation of that trust, they refused to deliver them to the appellees.

The jurisdiction of a court of equity to compel a surrender of specific securities may, in such a case as this, rest upon either of two grounds: (1) That because of the nature and character of the property a court of equity is the natural and appropriate forum in which to obtain such relief, because no adequate remedy is available at law, and (2) that the property is held under a constructive trust enforceable in a court of equity.

(1) In *Scarborough v. Scotten,* 69 Md. 137, it appears that Hugh F. Scarborough endorsed and delivered certain promissory notes and single bills to William Scotten and directed him to collect them and deliver the proceeds to Francina Scarborough, the wife of Hugh F. Scarborough, but Scotten died before the notes were collected, and his executors took possession of them. Francina Scarborough then assigned her interest in the notes to Hugh her husband, and he demanded them of the executors of Scotten, and, upon their refusal to surrender them, he filed a bill in equity against them, praying that they be compelled to surrender the notes to him. The lower court sustained a demurrer to the bill on the ground that the appellant had an adequate remedy at law. But this court reversed that ruling on the ground that there was no adequate or complete remedy at law, and in its opinion, after citing *Story on Equity* in support of the rule that equity will decree "the delivery up of

deeds and other writings to those who are entitled to them," it quotes with apparent approval parts of the following passage from the same author: "But where the title to the possession of deeds and other writings depends upon the validity of the title to the property to which they relate, and he is not in possession of that property, and the evidence of his title to it is in his own power, or it does not depend upon the production of the deeds or writings, of which he prays the delivery,—in such cases he must first establish his title to the property at law before he can come into a court of equity for a delivery of the deeds. * * * The same doctrine applies to other instruments and securities, such as bonds, negotiable instruments and other evidence of property which are improperly withheld from the persons who have an equitable or legal interest in them, or who have a right to have them preserved. This redress a court of common law is for the most part incapable of affording, since the prescribed forms of its remedies rarely enable it to pronounce a judgment *in rem* in such cases, which is or can be made effectual. It is true that an action of detinue or even of replevin might in some few cases lie and give the proper remedy if the thing could be found; but generally in actions at law damages only are recoverable, and such a remedy must in many cases be wholly inadequate. This constitutes the true ground for the prompt interposition of courts of equity for the recovery of the specific deeds or other instruments." *Story Eq. Jur.* (14th ed.), par. 951. That the primary ground for equitable jurisdiction in such cases is the absence of any adequate, complete, or satisfactory legal remedy is pointed out not only in the quotation from *Story* to which we have referred, but in *Scarborough v. Scotten, supra,* where the court said: "There can be no doubt that the ground of interference by a court of equity, is the inadequacy of any legal remedy to give relief." And exemplifying that inadequacy in that case it adverted to the fact that the nature of the property was such that it could not be seized under a writ of replevin against the will of the defendants, and since the defendants had already refused to surrender

it upon demand, that remedy would be useless, and to the further fact that the adequacy of an action of trover could not be established without an inquiry into the solvency of the persons liable on the notes.

Even more in point is *Safe Deposit & Trust Company v. Coyle,* 133 Md. 343, where the facts were that Dr. Terence Coyle died leaving an estate which consisted in part of stocks and bonds valued at $86,000; that the distributees of his estate were his widow and certain collateral relatives; that she "unlawfully, wrongfully and fraudulently" seized and took possession of the bonds and converted the same to her use without taking out letters on her husband's estate; that she falsely and fraudulently stated that Dr. Coyle had left "practically nothing"; that at her death the adminis-trator of the estate of Dr. Coyle learned from the inventory filed in her estate that she had died possessed of stocks and bonds which she had concealed and withheld from the estate of Dr. Coyle, but which rightfully belonged to that estate, and the complainant prayed the court to administer the estate, to compel the executor of Mrs. Coyle to deliver the securities in controversy to the administrator of Dr. Coyle, that an account be taken of all interest and dividends col-lected by Mrs. Coyle or her executor from said bonds, and that it be required to pay to the complainant all sums due on account of such collections. The defendant demurred to that bill on a number of grounds, among which was this, "that if the plaintiffs had any remedy it is at law and not in equity and the court had no jurisdiction in the premises." The demurrer was overruled, and, in considering the pro-priety of that ruling, the court treated Mrs. Coyle as an executor *de son lorl* of the estate of Dr. Coyle and held that on that ground alone the court had jurisdiction to grant the relief prayed. *Hagthorpe v. Hook,* 1 G. & J. 277. But it went further and decided that absence of any adequate legal remedy was sufficient to support the jurisdiction of the court, and in that connection, after referring to Judge Irving's statement in *Scarborough v. Scotten, supra,* it said, speaking through Judge Boyd: "Judge Irving then went on to refer

to cases where trover or replevin would lie and might be sufficient, but sustained the right to proceed in equity because the legal remedy was inadequate to give full relief. Trover in some cases might be deemed sufficient, but the rule in Maryland is that the damages allowed in that action are for the value of the property at the time of the conversion, with interest up to the date of the verdict. If a judgment for damages in such cases cannot for any reason be collected, then the plaintiff might lose his property and his money, if he is to be confined to an action of trover, and at any rate if the property becomes more valuable, he is confined in trover to the value at the time of the conversion. So in replevin there are difficulties which may be avoided in equity. In case of this kind, where the defendants' testatrix was entitled to a distribution of one-half of her husband's estate, and according to the bill the original securities, or many of them, have been sold and others substituted for them, it would seem to be peculiarly appropriate for a court of equity to take jurisdiction."

Those cases cannot in our opinion be distinguished from this. Manifestly replevin would be futile and inadequate, because the property is of such a character that it could not be taken under the writ unless exhibited by the defendants, which, in view of their attitude, is too remote a contingency to merit serious consideration. Nor would trover be either adequate or complete, first, because in such an action the measure of damages would be the value of the property at the time of the conversion, while in this case the securities may be much more valuable now than they were at that time, and, second, because there is no reason why the estate should be compelled to take the risk of collecting any judgment which might be recovered in such a case.

A contrary view is expressed in 21 *C. J.* 62, where it is said: "The rule applicable to ordinary chattels applies to municipal and corporate bonds and stocks, which cannot be recovered in equity, unless for some reason such stock or bonds have a special value apart from market value, or unless there are special equities to support the bill, as where defend-

ant is insolvent." And that view is supported by such cases as *Cone v. East Haddam Bank,* 39 Conn. 88, and *Friedman v. Fraser,* 157 Ala. 191, but other cases cited are not in point, as *Lamb Knit Goods Co. v. Lamb,* 119 Mich. 568, and *Edelman v. Latshaw,* 159 Pa. 644, where the securities had been sold, or do not support the text, as *Equitable Trust Company v. Garis,* 190 Pa. 542, where it is said: "A bill in equity will lie, in appropriate circumstances, for discovery and delivery of possession of deeds and other muniments of title, certificates of stock, negotiable securities, and other personal property having special and peculiar value, which is not adequately represented by market price. The committee of a lunatic is the proper party to bring and maintain such bill for the lunatic's property. Such bill may be maintained by the committee against the husband of the lunatic, where he denies her title, or there is reason to apprehend that he will deal with the property in any way adversely to her interest." In the case last cited the court did not decide that a bill in equity would not lie to recover securities which had no special value apart from market value, but that where they did have such value it would lie to recover them.

But whatever the law may be elsewhere, in this state at least, upon the facts stated in the bill, we regard the question as settled by *Safe Deposit & Trust Co. v. Coyle, supra.*

(2) Appellees contend that appellants held the securities under a trust enforceable in a court of equity. To that appellants answer (1) that the allegations of the bill are mere opinions or conclusions based upon undisclosed facts, and are too vague and general to support the hypothesis of a trust, but that (2), if they can be treated as allegations of fact, nevertheless, no such inference can properly be drawn from them.

In respect to the first contention it may be conceded that the pleader must allege with certainty and precision facts sufficient to show the jurisdiction of the court to grant the relief prayed, and that mere conclusions, opinions, or inferences, without the facts upon which they are based, are not sufficient (*Lamm v. Burrell,* 69 Md. 274; *Miller's Equity*

*Proc.,* par. 92, 93), and in charging fraud the particular acts relied upon as constituting the fraud must be stated, and while it is not necessary to set out the evidence by which the fraud is to be proved (Ibid, par. 93), yet no mere general allegation of fraud, no matter how vehement or forcible the charge may be or how often it is repeated, is sufficient unless accompanied by the particular facts upon which the allegation is based. Ibid.

In substance the bill of complaint states that Edward McIntyre, after having spent his life as a tugboat engineer and mechanic, retired from business when he was about sixty years old; that at that time he had an estate large enough to require the attention of one having some knowledge of financial matters and some judgment and experience in making investments; that he himself had no such knowledge, and that in that situation he turned to his three children, who acted as his "confidential agents," and in whom he had "every faith and confidence," and he placed in their custody all of his personal property, and "he and his property were entirely in their hands"; that they received that property from their father "to be kept by them as his confidential agents and trustees, and to be delivered by them to him in his lifetime or, upon his death, to his personal representatives; but that upon his death they refused to deliver the property thus entrusted to him to his personal representatives, although requested by them so to do.

It must be admitted that these allegations are neither as complete or as specific as the rules of good pleading would demand, but that at most they state in effect that the securities were delivered to the appellants in trust to hold them for the decedent, and to surrender them to him upon demand during his life and to his estate at his death, and that they obtained possession of them while acting as confidential agents of their father. The question then is, Are these allegations sufficient to support the conclusion that appellants hold the securities involved in this appeal under a trust enforceable in equity? Personal property may of course be the subject of a trust (*Perry on Trusts,* secs. 67, 80), but to establish an

express trust it is essential that the legal title be transferred to the trustee (39 *Cyc.* 76), for if the legal and the equitable title remain in the same person there can be no trust, and the mere delivery of personal property by the owner to another to hold for him, without any intention on the part of the owner to divest himself of the legal title thereto, cannot possibly create a trust, but is a mere bailment. For manifestly the same person cannot at the same time possess as trustee the entire legal title and as *cestui que trust* the entire equitable title. 26 *R. C. L.* 1186. For that reason the facts alleged by the appellees are not sufficient to create an express trust, for while it is alleged that the bonds were delivered to the appellant "in trust" to be delivered to the owner or his personal representatives on demand, it is nowhere alleged that the owner intended to or did divest himself of the legal title thereto, or that the appellants intended to or did acquire the legal title to the property, or that they were authorized to do anything but keep them as custodians safely for the true owner. Such a transaction does not constitute a trust but is a bailment, and calling it a trust cannot make it one. It is also alleged in the bill that, when the property was given to appellants, the owner had confidence and trust in them, and that they were his confidential agents. But while that may be true, it has no special significance, for it applies to most bailments, for ordinarily reasonable persons do not entrust valuable property to those in whom they have no confidence. And when we come to consider the allegations relating to confidential relationship, we are unable to find any facts upon which those allegations rest. It is not alleged by the appellants that the owner was senile, dominated by them, that he relied upon them for direction in the management of his estate, or that he entrusted his estate to them to manage and administer, nor is it even directly alleged, although it is a possible inference, that he delivered the property to them because of any confidential relation.

Nor is the allegation that the appellants hold the securities, as trustees, custodians, and confidential agents sufficient, because those several offices are separate and distinct, and

each possesses incidents, obligations, and responsibilities different from the others. In our opinion, therefore, the allegations of the bill are too indefinite and uncertain to show the existence of an express trust. Nor in our opinion are its allegations sufficient to raise a trust *ex maleficio* It is true that where property is delivered to a person upon his express promise to hold it for another in trust, and the delivery is induced by fraud, or by a confidential relationship between the parties, a trust *ex maleficio* will be raised where the express trust fails, and the promisor repudiates his promises. 26 *R. C. L.* 1232 *et seq.* But the fraud must be shown and it must appear that it was perpetrated at the inception of the transaction, and the existence and character of the alleged confidential relationship must be alleged, as well as the fact that the delivery was induced by it. 35 *A. L. R.* 314. For the mere failure of a promisor to perform his oral promise to hold property in trust is not sufficient (*Ibid* 288, 45 A. L. R. 851), where such failure does not involve fraud actual or constructive or the abuse of a confidential relationship. But, as we have already stated, while the bill alleges the existence of a confidential relationship, it does not state the facts upon which that allegation is based. Nor is it any more specific in its allegations of fraud. In alleging fraud in an equity proceeding, it is indispensable that the particular facts relied upon as its constituent elements should be definitely and specifically stated. *Miller's Equity Proc.,* sec. 93. But the bill in this case contains no such statements, and it is therefore not sufficient to support any conclusion based upon the existence either of fraud or of a confidential relationship.

There was no separate demurrer to so much of the bill as prayed the appointment of a receiver, and the power of the court to appoint a receiver in such a case is not therefore before us, and since, as we have already stated, the bill does show that the appellees have suffered a wrong for which they have no adequate remedy at law, it follows that the demurrer, which was to the whole bill, was properly overruled, and the decree appealed from will be affirmed.

*Decree affirmed, with costs.*