The bill of complaint is brought by the complainant, John H. DeMott, for an accounting by the defendant. Defendant attached its account to its answer and at the final hearing complainant conceded the correctness of the account except for three items appearing thereon.
Complainant inherited a considerable sum of money in 1929, and entered into certain relations with the bank for the purpose of administering his legacy. At the outset, the arrangement was purely oral, the bank opening an account on April 13th, 1929, denominated "National Bank of New Jersey as Custodian for John DeMott," which account was carried in its trust department under the direct supervision of Albert W. Rohde, the then trust officer. Through this account the bank thereafter handled changes of investments for DeMott. It is with respect to three purchases for this custodian account that DeMott complains, namely, purchases on September 15th, 1930, October 18th, 1930 and December 22d 1930, aggregating a total of three thousand eight hundred and forty-five shares of Consolidated Chemical Company common stock voting trust certificates, costing $96,125. DeMott contends that these purchases were not authorized by him, and says the first he learned of them was on March 11th, 1932; that the Consolidated Chemical Company was incorporated to take over the assets of the Miner-Edgar Chemical Company, then in reorganization, that the reorganization *Page 398 
was never completed, and that the voting trust certificates are worthless.
DeMott testified that he left for California in the fall of 1930, and before leaving discussed with Rohde the possibility of liquidating certain securities received in distribution of his legacy, and their replacement with others by which he could recoup a paper loss of some $100,000; that his leaning was toward investment in bonds, but on Rohde's advice that common stocks had a better chance of appreciation, he authorized Rohde to select good listed diversified common stocks, and for that purpose left with Rohde several blank authorizations to purchase securities, to be filled in when it was determined by Rohde what to buy; that he learned for the first time that Consolidated Chemical Company voting trust certificates had been purchased for his account in March, 1932, while he was being questioned about his holding by an agent of the United States department of justice; that he came to New Brunswick on April 21st, and conferred with Messrs. Parker, Weiler and Rohde, respectively president, assistant trust officer and ex-trust officer of the bank, and that he was then shown a completed authorization covering the purchase of the stock in question, which he denied having signed; that it was arranged that Rohde should liquidate the stock at the rate of $5,000 per month, whereupon he endorsed the certificates for transfer, but that he has received nothing on account of the stock.
There was considerable testimony in this case concerning the interrelation of the Miner-Edgar Chemical Company, the Consolidated Chemical Company, the defendant bank, and Mr. Rohde as syndicate manager of the group interested in the reorganization of the Miner-Edgar Company. In my view of the case, however, the interrelation is unimportant, for the reason that the testimony leaves no doubt in my mind that DeMott either knew of the investment in Consolidated Chemical Company certificates at the time it was made for his account or thereafter upon receipt of notice of the purchase, ratified and confirmed same.
The bill was framed and the case tried on the theory that *Page 399 
the writing hereafter set forth evidences an express trust, or in the alternative, if that writing be merely the evidence of the creation of an agency, then that agency, coupled with the confidence reposed by complainant in Mr. Rohde, defendant's trust officer, and the abuse of that confidence by him caused a constructive trust to arise.
As to whether there was an express trust created by the so-called custodian letter, the proofs show, that on August 1st, 1929, there was created an irrevocable trust known as the "John H. DeMott Personal Trust," wherein there were transferred to the bank as trustee certain securities, the income from which was to be paid to complainant for life, with certain gifts over upon his death. On August 22d 1929, a second trust was created, known as the "Sarah Jane Winifred DeMott Trust," again constituting the bank trustee, the purpose of that trust being to provide a property settlement in lieu of alimony claimed by DeMott's wife, Sarah. On or about August 7th, 1930, a third document, the one here under consideration, was executed by DeMott, which was dated May 23d 1930, and which is endorsed "Custodian Agreement," and reads as follows:
"May 23, 1930.
"National Bank of New Jersey New Brunswick, N.J.
"Dear Sirs: —
"This will authorize you to open a Custodian Account in the name of the undersigned on the books of your Company and to hold any securities or other property deposited with you for such account subject to the following instructions, which are to remain in force until expressly revoked in writing by the undersigned, or my legal representatives.
"You will please collect whatever income and principal may become due on such property and the proceeds of the sale of any thereof, and remit principal upon instructions from John H DeMott, and remit income monthly with statement.
"You may have any securities held for my account transferred into the name of your nominee in order to facilitate the collection of income but your responsibility to me shall not be thereby impaired.
"You are hereby authorized to execute as agents in the name of the undersigned all necessary certificates of ownership that may be required under the Federal Income or other Tax Regulations now or hereafter in effect inserting on such certificates the name of the *Page 400 
undersigned as the owner of the security but without claiming thereon any personal exemption on securities containing the so-called `Tax Free Clause', my status being that of over $4,000.00.
"It is further understood that you will use your best efforts for my account and risk to make purchases and sales of securities and other property and to reinvest the proceeds of such sales as I may from time to time direct you in writing, but you shall be under no responsibility for failure so to do if you shall have acted in good faith.
"It is understood and agreed that your Company shall be under no duty to take any other action with respect to any property deposited by me unless specifically agreed to by you in writing or to appear in or defend any suit with respect thereto unless requested by me in writing and indemnified to your satisfaction.
"It is understood that as compensation for your services hereunder you shall be entitled to receive 5% on income.
"The undersigned agrees to be responsible for all expenses incurred by you in connection with this account and any taxes or other charges required to be paid by you in connection therewith and you are authorized to charge my Custodian Account for all such expenses, taxes and charges.
"Until otherwise instructed, please mail all communications concerning such account as follows:
Name John H. DeMott Address R.F.D. No. 1, Princeton, N.J., or Box 322, New Brunswick, N.J. "Very truly yours, (sgd) John H. DeMott. "Form 35 "See Securities transferred as of August 7, 1930."
No new account was set up in the trust department, as had been done after the creation of the two first mentioned trusts, but the existing custodian account was continued. In view of the existence of the "John H. DeMott Personal Trust," I do not believe that DeMott intended to set up a second trust for himself by means of the above "Custodian Agreement," despite his present assertion (contradicted by his own letters in evidence), that he never referred to it as a custodian account, but always as a trust. It is more consistent with the facts to believe, as testified by Rohde, that the custodian account was merely a catch-all for securities of less than prime grade, which latter were either in the John DeMott trust or the Sarah DeMott trust, both of which are obviously designed to provide a fixed income for their respective beneficiaries. *Page 401 
But disregarding the circumstances surrounding the execution of the "Custodian Agreement," whether or no an express trust has been created is a matter of intention, to be gathered from the instrument creating the trust. While there is some authority to the contrary, the better rule would seem to be that without the vesting of legal title in the trustee, there is no express trust. Illustrating that current of authority which sees a trust more readily than is necessary or desirable, is the case of Andrew
v. Citizens State Bank of Eagle Grove, 203 Iowa 345;212 N.W. Rep. 745; 51 A.L.R. 906, wherein the buyer of Liberty bonds left them with a bank, subject to a duty to deliver them to the buyer on ten days' notice, but with a power in the bank to pledge the bonds, the court saying: "Clearly there was a trust relation. The transaction constituted a bailment and every bailment is a trust." It might be argued that it makes no difference what a given legal relation is termed; that the words "bailment," "agency," and "trust" are merely labels. But a label necessarily imports the contents of the package, and it is handled accordingly. It is risky to tag a container of gasoline "water" — someone later may attempt to extinguish a fire with it. So to carelessly call the "Custodian Agreement" above set forth a trust agreement involves a train of consequences that were never intended by the parties, and which I refuse to thrust upon the defendant despite the strenuous insistment of the complainant that he regarded it as a trust agreement from the outset.
Express trusts are those which are created in express terms either by a writing or orally where the latter is not barred by the statute of frauds, in any of which instances, there must be an absolute parting, on the part of the settlor, with the interest which had been his up to the time of the declaration of trust in the specific property to be held by the trustee. Whatever else may be requisite, the sine qua non of an express trust is that the trustee have legal title to the trust res. Of course, no particular words are necessary to pass that title from the settlor to the trustee, and any language importing such a transfer would be sufficient. In contrast *Page 402 
to the language of the "Custodian Agreement," it is significant that in creating the "John H. DeMott Personal Trust," DeMott "does now by his deed of grant and assignment * * * grant, convey, assign, transfer and set over unto said trustee * * * in trust * * *" certain securities. The "Custodian Agreement" may be searched in vain for any similar evidence that title to the securities "deposited" thereunder passed to the bank. Agency agreement it may be; trust agreement it is not. Tucker v.Linn (N.J.), 57 Atl. Rep. 1017; Taylor v. Coriell, 66 N.J. Eq. 262,272; Colantuoni v. Balene, 95 N.J. Eq. 748; McIntyre
v. Smith, 154 Md. 660; 141 Atl. Rep. 405. It follows therefore that the bank did not breach its duties as trustee, since it was not a trustee.
What then of the constructive trust? The essence of complainant's case is that the certificates were purchased for his custodian account without notice to him. He testified, on cross-examination, that he had endorsed the certificates for transfer at the time of the conference of April 21st, 1932, and that he had not been in New Brunswick from November, 1931, to April 19th or 20th, 1932. I am compelled to believe that it is not the fact that the endorsement was then made, and consequently DeMott knew of the purchase some time prior to November of 1931. Mr. Warren R. Schenck, a reputable member of the bar of this state, testified that he saw the certificates so endorsed a day or two prior to April 5th, 1932, that being the date on which the witness had the certificates and the endorsement thereon photostated. If it were necessary, there is ample corroboration of his testimony on this point.
As to DeMott's testimony that "he never heard tell of the stock" prior to the spring of 1932, and his protestations generally of profound ignorance of the entire transaction, I am compelled to disbelieve him. There was offered in evidence a list of securities held for his custodian account, which list was sent to him for approval by the bank's auditor on February 6th, 1931, and approved and returned by DeMott, who admitted receipt of the list and his signature approving it. The first security on that list was "3845 Shs. *Page 403 
Consolidated Chemical Corporation Voting Trust Certificate Common No Par." Again on July 28th, 1931, a letter was written to DeMott in answer to his inquiry concerning diminution of income, which letter stated "there is at present in your Custodian Account securities as shown by the enclosed list." The receipt of both letter and list was admitted by DeMott, and his denial that the Consolidated Chemical shares appeared on that list is met by the assertion that they did appear by a defense witness whose credibility was unimpeached.
That DeMott was not in fact in ignorance of the acquisition of the Consolidated Chemical certificates for his account is further indicated by a memorandum of the conference of April 21st, 1932, which was signed and approved by him. That memorandum recites the previous conferences between DeMott and Rohde concerning reinvestment of the proceeds of the sale of rubber and other stocks and that thereafter the Consolidated Chemical certificates were acquired. There then appears this significant statement: "Mr. DeMott was insistent that he had not authorized so large an investment in any one company, and Mr. Rohde was equally confident that that was the arrangement." That DeMott was concerned not with the investment itself, but merely with the size of it, is also apparent from his acquiescence in Rohde's suggestion that he work out the holding for DeMott at the rate of $5,000 per month.
I am therefore forced to conclude that I can give no credence to DeMott's testimony that he never authorized the purchase of the three thousand eight hundred and forty-five shares of Consolidated Chemical Corporation voting trust certificates, because of the maxim falsus in uno, falsus in omnibus. The purchase being authorized in writing by DeMott, the defendant bank is under no liability to him because of that purchase. It may be that Rohde was overenthusiastic in his hopes for the reorganization of the Miner-Edgar Company when he procured the authorization from DeMott, but DeMott admits knowing that Rohde was involved in the reorganization, which should have served as a warning to discount that over-enthusiasm. *Page 404 
There is a further reason why the complainant is not entitled to prevail. Even if the purchase were completely unauthorized, and even if it were thereafter not ratified, relief must be denied by virtue of complainant's election not to rescind the transaction. Having learned of the purchase for his account admittedly as early as March 14th, 1932, complainant gave no notice of his election to rescind until the bill of complaint was filed, on April 21st, 1933. This long acquiescence in his ownership of the certificates affords plenary evidence of his election to abide by the contract made in his behalf, and waiver of the fraud, if any there was. Faulkner v. Wassmer, 77 N.J. Eq. 537; Clampitt v. Doyle, 73 N.J. Eq. 678; Dennis v. Jones,44 N.J. Eq. 513; Snyder v. Czerminski, 108 N.J. Eq. 113.
There being no trust involved, either express or constructive, the case resolves itself into one of agency. In the absence of a motion to dismiss the bill because the remedy at law is adequate, and the defendant having submitted its account annexed to its answer, the concurrent jurisdiction of chancery in matters of account will be exercised to the extent of retaining the bill and denying relief to complainant, and allowing the defendant's account in all respects.
I will advise a decree accordingly, with costs to defendant. *Page 405